NO FEE

FILED
CLERK, U.S. DISTRICT COURT

MAR 27 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: ___RS___ DEPUTY

AMY J. LONGO (Cal. Bar No. 198304)
Email: longoa@sec.gov
DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
DAVID S. BROWN (Cal. Bar No. 134569)
E-mail: browndav@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

2:19-CV-02284-PA-JEMx

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **(FILED UNDER SEAL)** |
| MOTTY MIZRAHI AND MBIG COMPANY, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 80b-14.

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Motty Mizrahi and MBIG Company reside in this district.

## SUMMARY

4.      The SEC brings this emergency action to stop an ongoing fraudulent investment advisory scheme, primarily targeting members of the Southern California Israeli-American community, that has defrauded at least 15 clients nationwide out of more than $3 million since June 2012.  The number of defrauded advisory clients and the amount raised may be significantly higher.

5.      Defendant Motty Mizrahi ("Mizrahi") operates through his sole proprietorship, MBIG Company ("MBIG").  Mizrahi holds himself out to advisory clients as a professional money manager, licensed broker, and certified public accountant ("CPA"), who uses sophisticated options trading strategies to generate "guaranteed" returns of between 2-3% per month.  Mizrahi further represents to his

1

advisory clients that they will not lose their money; that his investment strategy is risk-free; that their funds are secure; that he maintains a large cash reserve of client funds; and that clients can withdraw their money at any time. Mizrahi directs clients to deposit their funds in a bank account purportedly in the name of MBIG.

6.     Mizrahi's representations to clients are patently false and misleading. MBIG has no brokerage account, nor any bank account of its own—rather, clients unwittingly sent money to Mizrahi's personal bank account, from which he transferred client funds to his personal brokerage account. In his personal brokerage account, he has engaged in highly risky options trading on margin. Far from producing "guaranteed returns," his trading has produced nothing but persistent losses—totaling more than $2.2 million over the last four years. Clients cannot withdraw their funds, and their funds are not backed by cash reserves. Mizrahi has no broker registration, nor a CPA license. And from his personal brokerage account, Mizrahi has transferred at least $1.4 million to his personal bank account, and made payments for personal expenses—notwithstanding that his compensation was to derive from a percentage of trading "profits," of which he had none.

7.     Despite incurring persistent trading losses and diverting client funds to himself, Mizrahi continues to send his advisory clients, including as recently as March 15, 2019, false MBIG monthly statements showing positive account balances and monthly gains from MBIG's trading, even when the only brokerage account Mizrahi traded suffered losses. When clients demand proof of MBIG's securities holdings, Mizrahi falsely tells them that MBIG has an active brokerage account at E*Trade and, as "proof," he shows clients fabricated brokerage statements reflecting a multi-million dollar balance—most recently, $9.4 million—for a MBIG account at E*Trade. MBIG, however, has never had an account at E*Trade, and E*Trade closed all of Mizrahi's personal accounts as of November 1, 2018.

8.     Mizrahi subsequently opened a new brokerage account with TD Ameritrade in his own name, into which he has deposited at least $288,500, and has

2

since withdrawn at least $76,500. Mizrahi's trading in his TD Ameritrade account has produced net losses overall, even though he continues to represent to his clients that his trading is profitable and their monies are secure.

9. To avoid detection of his scheme, Mizrahi recently encouraged clients to provide false information to the SEC concerning the nature of their investments with MBIG, directing several clients to tell the SEC that their individual investments with MBIG were "loans."

10. By engaging in this conduct, Defendants have violated and continue to violate the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a)-(c) thereunder, 17 C.F.R. 240.10b-5 (a), (b) &(c), and of Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

11. The SEC seeks a temporary restraining order, asset freezes and an accounting; an order to show cause regarding a preliminary injunction; permanent injunctions; disgorgement with prejudgment interest, and civil penalties.

## **THE DEFENDANTS**

12. Motty Mizrahi, age 46, is a resident of Tarzana, California. He operates MBIG as a sole proprietorship. According to publicly available information, Mizrahi was, until recently, employed as the director of finance at a Los Angeles area private high school.

13. MBIG Company is a purported entity of unknown form located in Encino, California. In June 2012, Mizrahi filed a fictitious business name statement for MBIG in Los Angeles County, California, and he apparently operates MBIG as a sole proprietorship, or a name under which he does business (a "d/b/a").

## **THE ALLEGATIONS**

### A.    Defendants Promise Advisory Clients High, Guaranteed Returns

14. Prospective clients know Mizrahi either from their Los Angeles-area synagogue or were introduced to him through family and friends in the Israeli-American community.

3

15.     Since at least June 2012, Mizrahi and MBIG have raised at least $3 million from approximately 15 advisory clients in Los Angeles, New York, and Israel.

16.     On information and belief, Mizrahi and MBIG may be continuing to raise additional funds from advisory clients, and may have approximately 50 additional advisory clients who invested funds.

17.     Mizrahi runs MBIG from his parents' apartment in Encino, California.

18.     Mizrahi solicits advisory clients primarily through in-person meetings in MBIG's "office" or in prospective clients' homes.

19.     Mizrahi has showed several clients charts and graphs of MBIG's purportedly successful rates of return before they invested.

20.     Mizrahi provided at least one investor a document titled "MBIG Company Prospectus" before that investor invested.  The two-and-a-half page prospectus is little more than a description of MBIG's purported investment methods and profitable track record, and a profile of Mizrahi.

21.     Mizrahi has represented to clients orally and in MBIG's prospectus that he has expert knowledge of the stock market, and is a broker and CPA.

22.     MBIG's prospectus touts Mizrahi's experience and expertise as a basis for MBIG's ability to generate returns, where it states that, "[client] funds are actively managed by . . . Mizrahi who is the president of MBIG. . . He has over 20 years of experience investing in the stock and option market."

23.     Mizrahi orally represents to clients that their funds are "guaranteed," "secure," and risk-free.

24.     Mizrahi promised at least one MBIG client in a document called "Investor Agreement" that he and MBIG "guarantie [sic] the 'Investor's' principle [sic] investment in full. . ."

25.     Mizrahi orally represented to clients that because he is "hedging" and "insuring" funds, he has never lost money, he cannot lose money, and his clients

1    would not lose their money even if the market declined.

2        26.    MBIG's prospectus represents that "MBIG has the ability to earn profits

3    when stocks are going up or down through options."

4        27.    MBIG's prospectus represents that the company would use options

5    strategies, including buying and selling of short call and short put spreads, and buying

6    and selling LEAP options.

7        28.    Mizrahi represented to at least one client, in an email dated August 26,

8    2014, that he and MBIG "guarantie [*sic*] the 'Investor's' principle [*sic*] in full."

9        29.    Mizrahi represents to clients that MBIG has achieved significant trading

10    profits.

11        30.    For example, MBIG's prospectus represents that MBIG's annual rate of

12    return between 2009 and 2016 ranged from a low of 30.91% in 2012 to a high of

13    102.24% in 2009, net of MBIG's compensation.

14        31.    Mizrahi also orally represented to clients that they would earn 2-3% per

15    month, roughly 30-40% per year.

16        32.    Mizrahi represents that clients can withdraw their funds at any time.

17        33.    For example, MBIG's prospectus represents that MBIG uses only 25%

18    of the clients' funds to trade securities, while keeping the remaining 75% in a cash

19    reserve.

20        34.    Mizrahi represented to another client in emails styled as "welcome

21    letters" dated April 19, 2013, October 24, 2014, and December 18, 2014 that: "The

22    funds can withdrawan [*sic*] at anytime."

23        35.    MBIG's prospectus represents that "MBIG, most of the time, only

24    utilizes 20%-30% of the funds when it identifies good opportunities, and remaining

25    funds are left in cash."

26        36.    Mizrahi assures clients that he is acting in their best interest and he treats

27    client funds with utmost care.

28        37.    For example, MBIG's prospectus represents that "MBIG professionally

manages and monitors funds" and "clients' investments are very important to [Mizrahi] and he treats them as he does his own. . . High ethical standards are very important to him and his clients' interests are always dear to his heart."

38.     Other MBIG documents Mizrahi gave to clients, in the form of "welcome letters," represented that:  "At MBIG we manage your investment in a professional manner.  Our goal is to maximize profits while managing your investment in a reliable and responsible manner" and that clients "should have full confidence that your investment is in good hands."

39.     Mizrahi gave some clients an "Investor Agreement" dated August 26, 2014 and September 1, 2016, which represented that MBIG will receive "25% of all profits generated."

40.      MBIG's prospectus represents that its annual rates of return were net of its "25% profit sharing."

41.     MBIG's clients had a history of reinvestment with MBIG.  For example, clients invested additional funds based on their MBIG Monthly Statement, which reflected monthly gains and a growing account balance.

42.     Mizrahi also encouraged clients to reinvest their monthly gains so they could make even higher profits and clients felt reassured as other members of the community described that their MBIG accounts were profitable and growing.

**B.     Mizrahi's Losing Securities Trading and Misuse of Client Funds**

43.     Mizrahi directs clients to deposit investment funds into a bank account identified as an "MBIG Company" account at Bank of America, account number ending in 4113.

44.     The account that Mizrahi told clients was an "MBIG Company" account, account number ending in 4113, is Mizrahi's personal bank account, on which MBIG is also listed.

45.     Clients tendered investment funds to Mizrahi and MBIG by wire transfer, check, and cash.

46.     Between January 2015 and February 2019, Mizrahi transferred $3.4 million of what appear to be client funds from his personal bank account at Bank of America (account number ending in 4113), plus an additional $700,000 from an individual that might be Mizrahi's relative and a MBIG client, to his personal brokerage accounts at E*Trade (account numbers ending in 9547 and 2632) and TD Ameritrade (account number ending 2652).

47.     During the same period, Mizrahi purchased $15.1 million of securities on margin, and sold $12.8 million worth of securities, respectively, in his personal brokerage accounts at E*Trade and TD Ameritrade.

48.     Between January 2015 and February 2019, there were 15,904 options and equity transactions in Mizrahi's personal brokerage accounts at E*Trade and TD Ameritrade, which include orders, executions, cancellations, and contract expirations. All but five of the transactions were for the purchase and sale of options.

49.     Between January 2015 and February 2019, Mizrahi invested, on margin, up to 100% of the available assets in securities trading, much of it in high-risk options trades.

50.     Mizrahi's options trading activity included calls and puts of different expiration dates in 14 different issuers including Facebook, Baidu, SPDR S&P 500 ETF, Netflix, and Goldman Sachs Group.

51.     Between January 2015 and February 2019, Mizrahi's personal brokerage accounts at E*Trade and TD Ameritrade sustained cumulative net losses of over $2.2 million.

52.     Despite sustaining significant and consistent trading losses, Mizrahi used money from his personal brokerage accounts at E*Trade to pay a substantial sum to himself or to accounts he controls.

53.     Between January 1, 2015 and October 31, 2018, from his E*Trade accounts, Mizrahi wrote checks to MBIG (of which he is the sole proprietor) for over $1.3 million; made transfers of $51,000 to his personal bank accounts; wrote checks

7

to himself for $18,000; made cash withdrawals totaling over $12,000; spent nearly $2,000 on payment processors for which foreign transaction fees were incurred; and made purchases of over $1,000 at gas stations and stores.  Mizrahi also wrote checks totaling for $391,000 to an entity he does not control and which may belong to one of his relatives who may also be a MBIG client, and Mizrahi wrote checks to individuals believed to be MBIG clients for nearly $90,000.

54.   E*Trade terminated its account relationship with Mizrahi and closed his accounts effective November 1, 2018.  He opened a new personal brokerage account at TD Ameritrade.

55.   Mizrahi's TD Ameritrade account during March 2019 shows continued options trading on margin and a wire transfer out of the account on March 6 for $4,000 to Bank of America account ending 4113.

**C.   Defendants' Fraudulent Monthly Account Statements Provided to Advisory Clients**

56.   Mizrahi and MBIG provided "Monthly Statements" to their advisory clients that set forth, among other things, an "account value summary," including beginning and ending balance; net gains and losses; and the client account's "performance" data, including purported realized/unrealized gains in dollars and percentage compared to the monthly performance of the "S&P 500" and "Dow Jones."

57.   Mizrahi and MBIG provided one client, who invested with MBIG for successive six-month terms over a two-year period, an "Investment Summary" that included "performance" data including gross gains and profit sharing amounts in dollars and realized/unrealized gains as a percentage of the gross gains.

58.   Certain advisory clients also received an "Annual Statement," which included the beginning and ending monthly balances, net gains or losses, and "ROI," representing the client's return on investment.

59.   The MBIG account statements and summaries provided to advisory

clients falsely indicated that MBIG clients never lost money from MBIG's securities trading, and that MBIG's trading consistently outperformed the S&P 500 and Dow Jones on a monthly basis.

60.     Any reasonable investor would have considered the true performance and balance of their funds material, and would have wanted to know the truth about Mizrahi's securities trading losses.

61.     Mizrahi knew, or was reckless in not knowing, that he was deceiving advisory clients regarding the performance and balance of their funds and his trading losses.  He was also negligent and did not exercise reasonable care in ensuring that the truth was disclosed to these clients.

**D.     Defendants' Material Misrepresentations and Omissions**

    **1.     Mizrahi Misrepresented His Trading Success and Clients' Account Balances and Monthly Gains**

62.     Mizrahi represented that MBIG clients' funds were "guaranteed," "secure," and risk-free; that he never lost money; and that clients would not lose their investments.  In reality, however, Mizrahi's securities trading between January 2015 and February 2019 produced net losses of $2.2 million overall, and Mizrahi's TD Ameritrade account shows that during March 2019 he continued to trade options on margin and transfer funds out of account to Bank of America account ending 4113.

63.     Further, although Mizrahi represented to clients that MBIG could generate returns between 2-3% per month and MBIG's prospectus represented that MBIG generated rates of return of 37.33% in 2015 and 32.82% for 2016 (net of Mizrahi's 25% profit sharing fee), Mizrahi's trading losses for 2015 and 2016 amounted to $179,680 and $1,191,735, respectively.

64.     Despite incurring persistent trading losses, Mizrahi sent, and continues to send, clients MBIG Monthly Statements showing false positive account balances and monthly gains from MBIG's trading even when the only brokerage account Mizrahi traded suffered losses.

65.    For example, on or about February 8, 2019, Mizrahi sent several MBIG clients their December MBIG Monthly Statements, which showed a gain of 1.92% even as the Monthly Statement showed declines of the S&P 500 of 9.18% and Dow Jones of 8.66% for the month.

66.    However, Mizrahi's TD Ameritrade brokerage records for December 2018 reveal net trading proceeds of negative $81,233 for the month.

67.    As recently as March 15, 2019, Mizrahi sent several clients their January 2019 MBIG Monthly Statements that each showed monthly gains of 1.88% compared to increases set forth on the Monthly Statements for the S&P 500 of 7.87% and Dow Jones of 7.17% for the month, whereas Mizrahi's TD Ameritrade brokerage records for January actually show net trading proceeds of negative $51,661 for the month.

68.    Any reasonable investor would have considered it material that their funds were neither secure, risk-free nor guaranteed to produce advisory returns, and would have wanted to know the truth about Mizrahi's securities trading losses.

69.    Mizrahi knew, or was reckless in not knowing, that he was deceiving advisory clients regarding the performance and balance of their funds and his trading losses.  He was also negligent and did not exercise reasonable care in ensuring that the truth was disclosed to these clients.

**2.    Mizrahi Misrepresented His Compensation**

70.    MBIG's Investment Agreement represented that it will receive "25% of all profits generated."  MBIG's prospectus represented that it receives "25% profit sharing."

71.    Although Mizrahi's personal brokerage records show no profitable trading over the four-year period between January 2015 to February 2019, Mizrahi wrote checks to MBIG (essentially himself, as a d/b/a) for over $1.3 million; made transfers of $51,000 to his personal bank accounts; wrote checks to himself for $18,000; made cash withdrawals totaling over $12,000; and spent over $3,000 on personal expenses.

72.    Any reasonable investor would have considered it material that Mizrahi was receiving compensation beyond the amount represented, while advisory clients' accounts were suffering losses—since Mizrahi's securities trading was not profitable, but incurring losses.

73.    Mizrahi knew, or was reckless in not knowing, that he was misrepresenting his compensation.  He was also negligent and did not exercise reasonable care in ensuring that his true compensation was disclosed to these clients.

### 3.    Mizrahi Misrepresented the Existence of a Cash Reserve and Clients' Ability to Withdraw Funds

74.    Mizrahi represented that he would keep 75% of client funds in a cash reserve; however, the brokerage records of his securities trading on behalf clients reflect no such reserve.

75.    Records of Mizrahi's trading instead reflect that between January 2015 and February 2019, Mizrahi invested, on margin, up to 100% of the available assets in securities trading, the majority of it in options.

76.    Mizrahi promised clients they could withdraw their money at any time.

77.    However, given Mizrahi's persistent trading losses and diversion of client funds to himself, MBIG advisory clients were unable to withdraw their funds, despite repeated requests.

78.    For example, two MBIG clients filed lawsuits in state court in September 28, 2018 and December 21, 2018 against Mizrahi and MBIG, seeking the return of their funds. Mizrahi and MBIG have not filed a response to either lawsuit.

79.    Another client, in or about April 19, 2018, filed a police report with the Los Angeles Police Department, after Mizrahi refused to return the client's funds.

80.    When clients requested return of their funds, Mizrahi sometimes gave them checks on which he wrote "do not deposit without written consent," and then withheld consent for the checks to be deposited.

81.    For example, Mizrahi gave one client a total of nine checks for $10,000,

each dated April 2, 2018, May 2, 2018, June 20, 2018, August 2, 2018, August 30, 2018, October 10, 2018, November 7, 2018, and December 7, 2018.

82.    When the client attempted to cash the April 2, 2018 check, it was declined for insufficient funds.  Thereafter, the client did not attempt to negotiate the remaining checks because Mizrahi never gave his "written consent."

83.    Mizrahi gave other clients checks that were returned for insufficient funds.  For example, Mizrahi gave a client two checks dated March 14, 2017 totaling $496,729.35 that did not clear the client's bank account because Mizrahi stopped payment.

84.    Mizrahi gave another client checks dated March 2, 2018 for $25,867 and August 1, 2018 for $2,000 that did not clear the client's bank account due to insufficient funds.

85.    Mizrahi has given clients a series of false excuses and explanations as to why he cannot honor requests for return of client funds.

86.    For example, Mizrahi has cited, among other things, "market conditions," waiting until "contracts expired" or for receipt of funds that "will be coming from Israel," waiting for authorization from the Israeli equivalent of the IRS, "margin requirements," trades have not cleared, and that his E*Trade account was frozen.

87.    Mizrahi has given clients written assurances that client funds would be returned, which have not been honored.  For example, Mizrahi signed a "Payment Agreement" with one client, dated April 3, 2018, agreeing to pay the client the total of $400,000 by June 2, 2018; Mizrahi later reneged.

88.    As another example, Mizrahi signed on December 10, 2018 a written promise that he would pay one client $50,000 from that client's "investment account" on or before December 27, 2018; Mizrahi has to date provided no funds.

89.    Mizrahi represented to at least two clients in writing on October 18, 2018 and November 2, 2018 that they would receive a "distribution" of their "share"

of $8,660,000 worth of "contracts" MBIG held at E*Trade that were "expiring" in October 2018 and December 2018.  At the time Mizrahi sent the November 2 email, E*Trade had already told him that it terminated his personal brokerage accounts. Mizrahi wrote to one of these clients in an email dated October 22, 2018:  "I promise you will get funds."  These clients have not, to date, received any funds.

90.    Any reasonable investor would have considered it material that there was no cash reserve for advisory clients' investments, and that their monies could not be withdrawn on demand.

91.    Mizrahi knew, or was reckless in not knowing, that he was misrepresenting the existence of a cash reserve and the availability of withdrawals. He was also negligent and did not exercise reasonable care in ensuring that the true state of affairs was disclosed to these clients.

### 4.    Mizrahi's Use of Fabricated E*Trade Statements to Deceive Advisory Clients

92.    When MBIG clients have sought assurances from Mizrahi that their funds are invested in the securities markets and are safely held, Mizrahi has showed them what appear to be brokerage statements for a MBIG account held at E*Trade.

93.    Mizrahi has shown clients what purport to be MBIG E*Trade statements including from July 2017 showing a month-end balance of $6,614,182.59; August 2017 showing a month-end balance of $6,670,604.45; January 2018 showing a month-end balance of $7,108,527.44;  February 2018 showing a month-end balance of $7,383,039.47; and September 2018 showing a month-end balance of $8,641,099.91.

94.    Mizrahi emailed one client on December 28, 2018 that:  "I have shown you the statements of this E*Trade account for 36 consecutive months indicating beginning and ending balances showing that the funds are there safe and 'alive' and therefore not missing, lost or stolen."  At the time Mizrahi wrote the December 28 email, his E*Trade brokerage accounts had been terminated by E*Trade for nearly

two months.

95.    Mizrahi  showed several clients, at an in-person meeting on February 21, 2019, a purported current account statement for a MBIG account at E*Trade that falsely reflected an account balance of $9.4 million.

96.    The account number on these purported MBIG account statements—ending in 9547—is identical to one of Mizrahi's personal accounts at E*Trade, which was closed by E*Trade effective November 1, 2018.

97.    At various times, including on or about February 21, 2019, Mizrahi has also falsely told clients that their funds are held in an account on E*Trade's "secure platform" which he can access only once a month using a link he receives by email and this account is not accessible through E*Trade's public website.

98.    For example, Mizrahi emailed one client on November 1, 2018 that: "It is impossible to get statements from the platform."

99.    MBIG does not have, and has never had, an account at E*Trade.

100.    Mizrahi's personal E*Trade accounts were terminated and closed effective November 1, 2018.

101.    E*Trade advised Mizrahi of the termination by phone and the firm sent Mizrahi written notices of the termination.  Prior to the termination of his accounts, Mizrahi falsely told E*Trade personnel that MBIG was "an accounting firm" and it does not hold any investments.  Mizrahi also falsely told E*Trade personnel that he did not provide an E*Trade account statement belonging to MBIG to any individual. Mizrahi also falsely claimed to E*Trade personnel that his E*Trade accounts may have been "hacked."

102.    Any reasonable investor would have considered it material that the account balances Mizrahi showed them were fictitious and that MBIG had no brokerage account with millions of dollars in funds.

103.    Mizrahi knew, or was reckless in not knowing, that he was deceiving advisory clients as to MBIG's purported brokerage account and its fictitious balances.

He was also negligent and did not exercise reasonable care in ensuring that the truth was disclosed to these clients.

### 5. Mizrahi Misrepresented His Licenses

104.    Although Mizrahi has represented he was a broker and CPA, he has never held any securities or CPA licenses.

105.    Any reasonable investor would have considered this information material and would have wanted to know the truth about Mizrahi's lack of professional licenses.

106.    Mizrahi knew, or was reckless in not knowing, that he was misrepresenting his professional credentials.  He was also negligent and did not exercise reasonable care in ensuring that the truth concerning his lack of credentials.

107.    Mizrahi made material misstatements to MBIG's advisory clients personally and on behalf of MBIG; as its sole proprietor, Mizrahi is the maker of any statements by MBIG.

### 6. Mizrahi and MBIG Acted as Investment Advisers

108.    During all relevant times, Mizrahi and MBIG, his d/b/a, acted as investment advisers to their clients.

109.    Mizrahi, as MBIG's sole proprietor, was responsible for managing clients' investments, and managed clients' funds on a discretionary basis.  He acted as the sole representative of MBIG when advising the clients about their investments; the clients looked exclusively to Mizrahi to manage their funds; and, pursuant to the discretionary authority that the clients had granted, Mizrahi personally managed the clients' investments.

110.    Mizrahi and MBIG received compensation in connection with managing clients' investments.

111.    As investment advisers, Mizrahi and MBIG owed clients a fiduciary duty, and were prohibited from making untrue statements of material fact or from omitting to state material facts necessary to make his statements not misleading.

112.   As sole proprietor of MBIG, Mizrahi's conduct, scienter and negligence are properly imputed to MBIG.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against All Defendants)**

113.   The SEC realleges and incorporates by reference paragraphs 1 through 112 above.

114.   As set forth above, Defendants Mizrahi and MBIG made several material misrepresentations to MBIG clients, including regarding the safety of their investment, the use of their funds, potential rates of investment returns, Mizrahi's qualifications, the existence of a cash reserve, and the ability of clients to withdraw money at their discretion.

115.   By engaging in the conduct described above, Defendants Mizrahi and MBIG, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

116.   By engaging in the conduct described above, Defendants Mizrahi and MBIG violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

### (against all Defendants)

117. The SEC realleges and incorporates by reference paragraphs 1 through 112 above.

118. As set forth above, by distributing false and misleading account statements, showing clients false MBIG account statements, and encouraging clients to provide false information to the SEC, Defendants Mizrahi and MBIG engaged in a scheme to defraud MBIG clients.

119. By engaging in the conduct described above, Defendants Mizrahi and MBIG, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and recklessly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

120. By engaging in the conduct described above, Defendants Mizrahi and MBIG violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## THIRD CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (against all Defendants)

121. The SEC realleges and incorporates by reference paragraphs 1 through 112 above.

122. As set forth above, Mizrahi and MBIG acted as investment advisers for

the clients of MBIG.  They received compensation in exchange for their investment advice.  They defrauded, and continue to defraud, MBIG clients by providing them with false MBIG account statements and false E*Trade brokerage statements and encouraging clients to provide false information to the SEC, and by making material misrepresentations regarding the use of funds, safety of the investment, potential rates of returns, the existence of a cash reserve, the ability to withdraw funds at their request, and Mizrahi's professional qualifications.

123.   By engaging in the conduct described above, Defendants Mizrahi and MBIG, and each of them, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, knowingly, recklessly and negligently:  (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

124.   By engaging in the conduct described above, Defendants Mizrahi and MBIG have violated, and unless restrained and enjoined, will to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and an order to show cause why a preliminary injunction should not be entered, temporarily and preliminarily enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal

18

service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5 and Sections 206 (1) and (2) of the Advisers Act [15 U.S.C. §§ 15 U.S.C. § 80b-6(1) and 80b-6(2)].

### III.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and an order to show cause why a preliminary injunction should not be entered, freezing the funds and assets of Defendants; prohibiting Defendants from destroying documents; ordering an accounting by Defendants; and ordering expedited discovery.

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 206 (1) and (2) of the Advisers Act [15 U.S.C. §§ 15 U.S.C. § 80b-6(1) and 80b-6(2)].

### V.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

### VI.

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)] and Section 209(e)(1) of the Advisers Act [15 U.S.C. § 80b-9(e)(1)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  March 27, 2019

*/s/David S. Brown*
Amy Jane Longo
Douglas M. Miller
David S. Brown
Attorney for Plaintiff
Securities and Exchange Commission